**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

EUNICE OSBORNE,

        Plaintiff,

v.                                                      CIVIL CASE NO. 05-74357
                                           HON. MARIANNE O. BATTANI

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

_____/

**OPINION AND ORDER ADOPTING
MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

**I.      INTRODUCTION**

Plaintiff Eunice Osborne brings this action under 42 U.S.C. § 405(g) challenging a final

decision of defendant Commissioner denying her application for Disability Insurance Benefits

("DIB") under sections 216(I) and 223 of the Social Security Act.  On November 20, 2002,

Plaintiff filed an application for DIB alleging an onset date of November 17, 2001, due to a right

upper extremity disability.  Admin. R.43, 57.  The Agency denied Plaintiff's application at the

initial stage.  Admin. R. 32.  On June 29, 2004, pursuant to Plaintiff's request, Administrative

Law Judge ("ALJ") Michael Wilenkin held a hearing during which Plaintiff, who appeared

without representation, testified.  Admin. R.207-33.  On July 26, 2004, ALJ Wilenkin issued a

decision denying benefits.  Admin. R.19-24.  The Appeals Council denied Plaintiff's request for

review, rendering the ALJ's decision the final decision of the Commissioner.  Admin. R.7.

Plaintiff filed for judicial review of the final decision on November 15, 2005.

1

The case was referred to Magistrate Judge Wallace Capel, Jr. pursuant to 28 U.S.C. §
636(b)(1)(B) to review cross-motions for summary judgment.  The Magistrate Judge issued a
Report and Recommendation ("R&R") on November 2, 2006, recommending that Plaintiff's
motion for summary judgment be granted in part, and that Defendant's Motion for Summary
Judgment be denied.  In his decision denying benefits, the ALJ stated that the Vocational Expert
("VE") considered Plaintiff's medications' side effects, and that if the VE were to consider
Plaintiff's side effects, she would be unable to work.  In the R&R, the Magistrate Judge found
that although the ALJ stated that the VE considered Plaintiff's medications' side effects, no such
testimony exists.  The Magistrate Judge found that the hearing transcript did not reflect
testimony from the VE, in which he considered Plaintiff's medication's side effects.

The Magistrate Judge did find, however, that the record reveals that Plaintiff reported
sleepiness as a side effect on November 19, 2002, in her Disability Report, on her Pain
Questionnaire on December 31, 2002, and in a work history form.  In addition, the Magistrate
Judge found that her physical therapy notes contained numerous inconsistencies regarding
reported sleep difficulty.  As such, the Magistrate Judge found that the ALJ's decision did not
reflect all of Plaintiff's limitations, and thus, remand was necessary to allow the ALJ to re-
examine the record to determine if medication induced drowsiness is indeed a limitation
supported by the record evidence, and if so, if there are jobs in significant numbers that Plaintiff
can perform.

On November 16, 2006, Defendant filed Objections to the R&R, contending that the
ALJ's decision was supported by substantial evidence.  Defendant contends that the ALJ did not

2

fail to consider Plaintiff's allegations that her medications caused side effects because there is nothing in the medical records to support her allegations.

For the reasons stated below, the Court ADOPTS the Magistrate Judge's R & R.

## II.    STANDARD OF REVIEW

A district court must conduct a *de novo* review of the parts of a magistrate judge's report and recommendation to which a party objects.  28 U.S.C. § 636(b)(1).  The district "court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate."  Id.  The requirement of *de novo* review "is a statutory recognition that Article III of the United States Constitution mandates that the judicial power of the United States be vested in judges with life tenure."  United States v. Shami, 754 F.2d 670, 672 (6th Cir. 1985). Accordingly, Congress enacted 28 U.S.C. § 636(b)(1) to "insure[] that the district judge would be the final arbiter" of a matter referred to a magistrate judge.  Flournoy v. Marshall, 842 F.2d 875, 878 (6th Cir. 1987).

Judicial review in a social security appeal is limited to determining whether there is substantial evidence supporting the ALJ's decision and whether the judge applied the correct legal standards in reaching that decision.  Elam v. Comm'r of Soc. Sec., 348 F.3d 124,125 (6th Cir. 2003), 42 U.S.C. § 405(g).  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Kirk v. Sec'y of Health & Human Servs., 667 F.2d 524, 535 (6th Cir. 1981) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  If substantial evidence supports a denial of benefits, that decision is not subject to reversal, even if the reviewing court determines that substantial evidence supports a contrary

3

decision.  Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986) (en banc); Kinsella v. Schweiker,

708 F.2d 1058, 1059 (6th Cir. 1983).

When determining whether the decision is supported by substantial evidence, the

reviewing court must take into consideration the entire record, including "whatever in the record

fairly detracts from its weight."  Mullen, 800 F.2d at 545 (citing Universal Camera Corp. v.

NLRB, 340 U.S. 474, 488 (1971)).  However, the court may not review the evidence *de novo*,

make determinations of credibility, or weigh the evidence.  Brainerd v. Sec'y of Health and

Human Servs., 889 F.2d 679, 681 (6th Cir. 1989).  Consequently, the substantial evidence

standard accords "considerable latitude to administrative decision makers," as "[i]t presupposes

that there is a zone of choice within which the decision makers can go either way, without

interference by the courts."  Mullen, 800 at 545 (citations and internal quotations omitted).

## III.    STATEMENT OF FACTS

### A.    Medical Evidence

Plaintiff's medical records document a motor vehicle accident in November 2001, during

which Plaintiff's car rear-ended another car.  Admin. R. 87.  The emergency room report

following the accident indicated that Plaintif had normal grip strength, ability to move her

extremities, and a normal neurological examination.  Admin. R. 87-88.  Later, however, Plaintiff

was diagnosed with right adhesive capsulitis after presenting with right upper extremity pain

Admin. R. 99.  Plaintiff underwent physical therapy.  Tr. 119-20.

April 2002, records from the Detroit Medical Center neurology clinic indicate that

Plaintiff had no muscle atrophy and showed normal strength in the right upper extremity.

Admin. R. 130. Plaintiff had only slightly decreased reflex functioning in the right biceps and some diminished pinprick over the C5 distribution on the right side. Admin. R. 130.

An October 2002, electromyography (EMG) study did not document any significant right upper extremity or neck pathology. Admin. R. 123, 125. She was diagnosed with mechanical shoulder pain with limited range of motion in by neurologist Steven Hinderer. Admin. R. 120. Dr. Hinderer observed on examination that she did not exhibit signs of reflex sympathetic dystrophy involving the right upper limb. Admin. R. 120. Physical examination revealed that the patient had a markedly frozen shoulder with almost no range of motion in flexion, external rotation and abduction, and poorly tolerated any attempts at motion. Admin. R. 125. He opined that Plaintiff needed to be "aggressively pushed" to mobilize her right upper limb, especially the shoulder. Admin. R. 125. He noted she was not taking any non-steroidal anti-inflammatory medication, and prescribed ibuprofen, as well as physical and occupational therapy. Admin. R. 125.

In November 2002, a physical therapist noted that Plaintiff had extreme limitations is dressing, grooming, ability to perform housework, cooking, and driving. Admin. R. 100. She complained of right arm and finger numbness and tingling. Admin. R. 102. However, she denied having pain involving the neck, face, chest, or back. Admin. R. 123. Her medications included Neurontin, Prednisone, and Tylenol #3. Admin. R. 62, 67. January 2003, occupational therapy reports indicated improvement in all areas of range of motion in the right upper extremity, and hand. Admin. R. 171.

In February 2003, Plaintiff underwent consultative examination by Dr. L. Patel. Admin. R. 111- 12. Dr. Patel noted that she had normal gait, could use her right upper extremity, flexed

5

at the elbow and shoulder, but would not move her right upper extremity or allow Dr. Patel to touch it during examination.  Admin. R. 112.  Plaintiff was evaluated at Detroit Medical Center on February 24, 2003, by Dr. Hinderer.  She  had persistent decreased range of motion of the right shoulder and hand.  Admin. R. 119.  She complained of burning pain.  Id.  The examiner noted that it was very difficult to obtain full manual muscle examination due to the patient's pain.  Id.  Active range of motion of the right upper extremity was very limited.  Id.  She was unable to actively extend her right wrist due to pain.  Id.  Dr. Hinderer's impression was mechanical shoulder pain with decreased range of motion throughout the entire right extremity.  Admin. R. 120.   Examination was incomplete, however, because Plaintiff claimed she felt pain.  Admin. R. 119.

Her reported pain level was rated 8/10 on March 18, 2003.  Admin. R. 143.  However, on March 28, a non-examining medical consultant reported that Plaintiff's ability to reach in all directions, handle (gross manipulation), and feel was limited.  Admin. R. 82.  The state agency physician reviewed the record and opined that Plaintiff could perform a range of light work, with limited ability to push or pull with the right upper extremity.  Admin. R. 80.  The state agency physician further opined that Plaintiff could only occasionally crawl or climb ladders, ropes, and scaffolds, and had limited ability to reach in any direction, handle items, or feel.   Admin. R. 81-82.

Physical therapy notes indicate that Plaintiff had poor attendance but still made improvements.  Admin. R. 164-65.  In April 2003, the Rehabilitation Institute left Plaintiff a message reminding her that three failures to show for her appointments would result in discharge from the program.  Admin. R. 161.  April treatment notes indicate that Plaintiff had markedly

improved right upper extremity range of motion but still felt pain or irritation.  Admin. R.

160-61.  She was able to demonstrate 3/4 of the available passive range of motion.  Admin. R.

160.  She also demonstrated improved active range of motion in the right shoulder, and

decreased tightness.  Admin. R. 156.  Plaintiff made "significant" gains in active range of motion

by the end of April 2003, gaining full range of motion in her fingers and the ability to pick up

half-inch objects with tools.  Admin. R. 154.

     In May 2003, physical therapists noted improved elbow extension.  Admin. R. 146.

Plaintiff tolerated her treatments well and improved the passive range of motion even though she

has some limitation due to pain.  Admin. R. 146.  By late May 2003, Plaintiff could open and

reach into the refrigerator with the right hand, and grasp and hold objects with the right hand

Admin. R. 144.  Her progress reached a plateau in June 2003.  Admin. R. 137.

     On July 8, 2003, she reported that she had severe difficulty/impairment in dressing,

grooming, meal preparation and housework, and was unable to drive.  Admin. R. 135.  Her

condition was noted to be improving on August 4, 2003, after physical therapy and use of a

muscle stimulation machine.  Medication included Neurontin and Ibuprophen.  Admin. R. 117.

**B.      Hearing Testimony**

     **1.      Osborne's Testimony**

     In her application for disability benefits, Plaintiff reported that she was unable to work

due to neck, right hand, and arm pain.  Admin. R. 57.  She is right handed.  Admin. R. 78.   She

reported that her medications caused her to feel drowsy.  Admin. R. 67.  Her medications

included Naproxen and Neurontin on June 14, 2004.  Admin. R. 77.  She reported having

difficulty writing and lifting, and needing help with bathing, dressing, and combing her hair.

Admin. R. 68, 69, 78.  Admin. R. 68.  She has help with cooking, shopping and housework.
Admin. R. 69-70.

At the hearing, ALJ Wilenkin introduced himself and the vocational expert, Dr. Edward
Brown.  Admin. R. 209.  He informed Plaintiff that the proceedings were being taped and that
she was to provide verbal answers to questions.  Id.  He also stated: "You, on any number of
occasions, have been advised of your right to be represented by an attorney or anybody else of
your choosing.  You may waive that right, if you wish.  I suppose, since you're here today,
alone, you wish to proceed without benefit of counsel."  Id.  Plaintiff responded that the ALJ was
correct.  Id.  She was given the opportunity to object to the admission of the proposed exhibits
into evidence.  Id.  She stated that she had no objection.  Id.

Plaintiff testified that she was born on December 13, 1964.  Admin. R. 210.  She stated
that she lives in a two-story home with a basement.  Id.  She sleeps on the first floor.  Id.  Her
three children, ages eleven, fifteen, and twenty, reside with her.  Admin. R. 211.  She was driven
to the hearing and does not drive, although she has a license.  Id.  She stated that she "like[s] to
try to drive."  Id.  She stated that her doctor does not want her driving due to drowsiness caused
by her medication.  Id.  She stated that she has been on medication since her car accident on
November 11, 2001.  Admin. R. 212.  She stated that her doctor keeps changing her medication.
Admin. R. 211.

She is a high school graduate and has an associate's degree.  Admin. R. 212.  She stated
that she is currently attending college in pursuit of her bachelor's degree in Special Education.
Id.  She stated that she attended school full-time the previous semester, and does not currently
work.  Id.  Previously, Plaintiff was employed with Detroit Public Schools at Weber Middle

8

School in the Special Education department.  Admin. R. 213.  She worked there beginning in September 1990, and stopped working in November 2001, after a car accident.  Id.  She stated that a car "came at [her] and [her] vehicle hit something," then she woke up in Sinai Hospital. Id.

She reported that she had car insurance that paid lost wages, but the payments stopped the year prior to the hearing.  Admin. R. 213-14.  She stated that an insurance agent called her and said that the best thing to do was to take a certain amount of money as a final payment and then file for disability.  Admin. R. 214.

She stated that she sustained neck injuries affecting the right side of her body.  Id.  She reported that she could not move her right, dominant arm, and she had to attend physical therapy. Id.  She stated that she continues to have problems relating to same and this keeps her from working.  Admin. R. 214-15.  She testified that someone told her that she would not be able to work.  Admin. R. 215.  She further stated that her right arm continues to be immobile and burns with pain "[a]ll over."  Admin. R. 215-16.  Her fingers tingle and pain shoots from her neck down her arm and radiates.  Admin. R. 216.  She stated that "sometimes, it feels like pins and needles are sticking in it."  Id.  She also stated her ring finger and index finger are the primary fingers involved in the pain in her right hand.  Admin. R. 216-17.  She has pain in her wrist shooting up and down and "[i]t feel[s] like burning, fire, burning pain."  Admin. R. 217.

Plaintiff stated that she learned to move her right arm, using her left arm at therapy and that her right arm has "[v]ery limited" movement on its own.  Id.  She stated that she cannot extend her right arm out to the side or reach it above her head, but she can reach above her head with her left arm.  Id.  She stated that there is little active movement with her right shoulder and

she cannot extend and bend her right arm at the elbow, either.  Admin. R. 218.  She stated that

she saw an occupational therapist as well as a physical therapist for a period from November

2001, until she stopped physical therapy in July 2003.  Admin. R. 218-220.  In therapy, they

used ice and heat as well as "electronoles" as part of her treatment.  Admin. R. 222.

Plaintiff treats with a neurologist and started treating with an orthopedic physician.

Admin. R. 221.  She stated that she was supposed to have some surgery, but has not been able to

do so, due to problems using an IV in her right arm.  Id.  She stated that her doctors may give her

"shots," but have not begun treatment with injections at this time.  Id.  She reported that she was

given exercises to do at home and a machine to hook up at home as well.  Id.

Plaintiff reported that she was prescribed medication, but that it does not do anything for

her, other than make her sleepy and groggy.  Admin. R. 222.  She has burning pain most of the

time, but she tries to deal with it or ignore it.  Id.  In addition to her problems with her right

upper extremity, Plaintiff's feet swell, and she is generally very tired.  Id.  Plaintiff reported that

she has gained a lot of weight, partly due to steroids that she was prescribed at one time in doses

taken four times a day.  Admin. R. 223.

Generally, she wakes up early around three or four in the morning and does not sleep

well.  Id.  When she wakes up she is sleepy, groggy, and dizzy.  Id.  Plaintiff stated that she can

feed herself, but her children help with her personal needs such as bathing and dressing.  Admin.

R. 223-24.  She is not able to dress herself because she needs someone to fasten buttons and

zippers for her.  Admin. R. 224.  She stated that she tries to dust lightly with her left hand to help

with housework, but she cannot cook and her father does most of the cooking as well as the

laundry.  Id.  She reported that her "dad do[es] everything."  Id.  She  stated that her three

10

daughters are busy with educational programs.  Id.  Plaintiff reported that she is involved with the church choir.  Id.  However, she no longer goes out to the movies, because she is too sleepy.  Admin. R. 224-25.  She stated that she is sleeps often and goes to her family room to sit when her medicine makes her dizzy.  Admin. R. 225.  She stated that she tries to do her best and "believe[s] [she is] going to overcome this."  Id.

She reported that she does "fine" in school.  Admin. R. 226.  She stated that sometimes people help her and type papers.  Id.  She stated that she tries to type left-handed, but still needs help if she cannot reach keys with her left hand or cannot press all the keys necessary with her left hand.  Admin. R. 226-27.  She stated that she reads the material or has someone translate it.  Admin. R. 227.  She stated that it is difficult for others to read her left-handed writing.  Id.  She plans on staying successful in school.  Id.  However, she testified that she sleeps a lot in class sometimes and has a seat up against the wall, but that the school understands.  Id.

### 2.    The Vocational Expert

Dr. Edward Brown, a vocational expert, testified at the hearing.  Admin. R. 226, 227-31.  The VE testified that Plaintiff's past work as a special education assistant was classified as semi-skilled, medium to heavy.  Admin. R. 226.  He stated that Plaintiff had transferrable clerical skills at the semi-skilled level.  Admin. R. 226.  The ALJ presented a hypothetical question to the VE regarding whether a claimant with Plaintiff's age, education, and work experience, whose testimony was an accurate description of her abilities, was capable of Plaintiff's past relevant work.  Admin. R. 227.  The VE testified that Plaintiff would not be capable of doing her past work.  Admin. R. 228.  Admin. R. 228-29.  However, he also stated that:

11

> [t]he work that she's doing in the University is the equivalent of light work, and the matter would swing from a vocational standpoint, although it's probably much more thorny [phonetic] in other ways, about how much accommodation they're really making for her. If they are, indeed, making serious accommodations in terms of having her keyboarding done for her, having her materials translated, whatever that means, for her in making these kinds of accommodations, then one can assume that this would be transferable to the world of work.

Id. When asked what positions would be available for such an individual, the VE testified

> [u]nfortunately, it would be well below the physical demands of the work that she wants to do, and it would have to be unskilled where she couldn't use her interests in helping other people. The only kind of point of entry, if her upper dominant extremity is in - affected to the degree that she describes, is some kind of custodial work, janitorial work, housekeeping work. All I - all those jobs capitalize on your ability to get around and have one useful extremity. She is certainly going the extra mile to stay in school and stay working, but those accommodations, unfortunately aren't usually something that's done in a workforce, so we'll have to look at unskilled work.

Admin. R. 228-29. The VE testified that about 3,200 such positions exists in the counties surrounding the hearing site and double that number exist for the whole state. Admin. R. 229. He further stated that his testimony was consistent with the Dictionary of Occupational Titles ("DOT"). Id.

Plaintiff was confused by the VE's testimony. Id. The VE reiterated his testimony in more simple terms and stated that there were jobs that Plaintiff could definitely do with the use of only one arm. Admin. R. 229-30. Plaintiff went on to talk with the VE, but the ALJ reminded Plaintiff only to ask questions of Dr. Brown about his vocational testimony. Admin. R. 230. Plaintiff then asked the VE about the medication Neurontin, but the VE testified that he "do[esn't] deal with that." Admin. R. 230-31. Plaintiff stated that her medication makes her sleepy and her doctor has advised her that she cannot operate certain machinery when she takes

12

it.  Admin. R. 231.  The ALJ responded that the VE testified that under the restrictions from her physician and therapist, she would not be able to do any work.  Admin. R. 231-32.

### C.    The ALJ's Decision

Plaintiff was 39 years old at the time of the ALJ's decision.  Admin. R. 20.  She had a high school education as well as an associate's degree in special education Admin. R. 63.  She previously worked as a special education assistant.  Admin. R. 49.  The ALJ found that Plaintiff was not fully credible.  Admin. R. 20-22, 23.  The ALJ found that the medical evidence established that the "claimant has some loss of mobility of the right upper extremity that is a 'severe' impairment," Admin. R. 23, but that she does not have an impairment as set forth in the Regulations.  Admin. R. 20.  He determined that Plaintiff had the RFC to perform "a significant range of light work[,]" using her left upper extremity.  Admin. R. 23-24.  The ALJ determined that Plaintiff could perform one-handed janitorial and custodian jobs, and thus, that Plaintiff was not eligible for disability.  Admin. R. 19, 24.

## IV.    ANALYSIS

In order to establish a compensable disability under the Social Security Act, a claimant must show that she is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted, or can be expected to last, for a continuous period of not less than 12 months.  42 U.S.C. § 1382(a)(3)(A).  The claimant bears the ultimate burden of establishing a disability within the meaning of the Social Security Act.  Casey v. Sec'y of Health & Human Servs., 987 F.2d 1230, 1233 (6th Cir. 1993).

Disability claims are evaluated through a five-step sequential process.  20 C.F.R. § 404.1520.  See also Kirk, 667 F.2d at 529.  The burden of proof to show a disability is on the claimant through the first four steps of the process.  If a claimant meets this burden, the fifth step shifts the burden to the Commissioner.  Preslar v. Sec'y of Health and Human Serv., 14 F.3d 1107, 1110 (6th Cir. 1994).  The first step of the process examines whether the claimant is currently engaged in substantial gainful activity.  If the claimant is so engaged, she is not disabled under the guidelines.  The second step examines whether the claimant has a severe impairment which significantly limits her ability to perform work-related functions.  Id.  If a severe impairment is found, the third step requires comparison of the impairment to those impairments listed in Appendix I, 20 C.F.R. § 404, Subpt. P (1981), to determine if, on the medical evidence alone, the claimant is disabled.  Id.  If the claimant is not disabled under the third step, the fourth step requires a determination of whether the claimant can perform relevant past work.  If claimant cannot perform relevant past work, the fifth step shifts the burden to the Commissioner to establish that the claimant has transferable skills which enable her to perform other work in the national economy.  Id.

The ALJ rendered findings favorable to Plaintiff at the first four steps of the disability determination process, thus, the question before the Court is whether Plaintiff is disabled under step five of this analysis; that is, whether Plaintiff retains the RFC to perform other work existing in significant numbers in the national economy.  The ALJ found that, although Plaintiff did not possess the RFC to perform her past relevant work, she retained the RFC to perform a significant range of light work because her claimed level of incapacity was not wholly credible.

Magistrate Judge Capel recommends that the Court remand the case to the Agency for the purpose of reviewing the evidence in the record concerning Plaintiff's side effects of drowsiness from medication and sleeping problems.  The Magistrate Judge found that, although the ALJ stated that the VE had considered Plaintiff's medications' side effects, no such testimony exists.  Further, the Magistrate Judge also determined that the transcript does not reflect testimony from the VE that he considered her medications' side effects or her need to lay down daily, even though the ALJ stated in his decision that "[t]he vocational expert was asked at the hearing whether the claimant could perform her past relevant work or any other type of work, assuming her testimony as to her limitations was accurate, except for her alleged need to lie down daily."  Admin. R. 20.  The Magistrate Judge also took issue with the ALJ's finding that "[t]he records fail to document any medication side effects."  Admin. R. 21.  Magistrate Judge Capel found that Plaintiff's reported side effects and sleeping difficulties, although inconsistent, were in fact documented within the physical therapy notes and her disability benefits application.  As a result, the Magistrate Judge determined that the ALJ should have considered the related complaints.

Defendant first objects to the Magistrate Judge's finding that the ALJ's decision was not based on substantial evidence because the ALJ failed to consider the allegations of side effects from medication.  The Court finds that the ALJ's decision was not based on substantial evidence.  The ALJ's decision was based, in part, on the VE's testimony.  "If the Secretary seeks to rely on [vocational expert] testimony to carry his burden of proving the existence of a substantial number of jobs that plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately describes the plaintiff in all significant,

15

relevant respects; for a response to a hypothetical question to constitute substantial evidence, each element of the hypothetical must accurately describe the claimant." <u>Felisky v. Bowen</u>, 35 F.3d 1027, 1035-36 (6th Cir. 1994)(citations omitted).

The ALJ posed the following question to the VE:

> Dr. Brown, with respect to the Claimant let's assume that we have the Claimant, a young woman possessed in the past educational background, past relevant work experience described. Assume if - also if you would, that her description of limitations is accurate. Under those circumstances, would she be able to perform her past relevant work, and if not, would she then be able to perform any work that exists in the State of Michigan, or metropolitan Detroit area?

Admin. R. 227. The VE responded by stating Plaintiff could not perform her past relevant work and that the type of work she is doing at the university is the equivalent of light work, and that whatever accommodations the faculty made on her behalf would be transferable to the workplace. Admin. R. 228. The ALJ then asked what type of work would be appropriate for a person limited to the use of one upper extremity. <u>Id</u>. The VE answered that the only type of work that would be appropriate for such a person would be "some kind of custodial work, janitorial work, housekeeping work." <u>Id</u>.

As Magistrate Judge Capel points out, nowhere in the transcript does the VE answer what type of work or the number of jobs that are available to a person with all of Plaintiff's claimed limitations. Nevertheless, at the end of the hearing, the ALJ responded to Plaintiff's statement that her doctor advised her not to use machinery and limited her arm movement by stating that the VE testified that, under those circumstances, she would be unable to work. Admin. R. 231. Likewise, in his finding, the ALJ stated "[t]he vocational expert was asked at the hearing whether the claimant could perform her past work, or any other type of work, assuming her

16

testimony as to her limitations was accurate, except for her alleged need to lie down daily."
Admin. R. 20.  Again, no such question was posed.

Although the first hypothetical question might have accurately described Plaintiff,
assuming that the VE knew of all of Plaintiff's alleged limitations, in all significant relevant
respects, the VE never gave a direct answer the multi-part question.  Instead, the VE testified
that Plaintiff could not perform her past relevant work, and that accommodations the university
faculty made on her behalf would be transferable to the workplace.  Admin. R. 228.  The ALJ
then asked what type of work would be appropriate for a person limited to the use of one upper
extremity, but did not mention any of Plaintiff's alleged limitations.  Id.  The VE responded by
stating that a number of custodial or janitorial jobs existed for a person with such a limitation.
Id.  Because the response to the ALJ's hypothetical did not accurately describe the claimant, it
cannot be used as substantial evidence to support the ALJ's decision.  Therefore, the VE's
response to the ALJ's hypothetical question cannot be considered substantial evidence
supporting his decision to deny benefits.

Defendant also objects to the Magistrate Judge's recommendation to remand this case for
analysis of sleep problems that Plaintiff reported at a few physical therapy sessions.  Defendant
argues that this is in error because there is no indication that she experienced any sleeping
difficulties as the result of any medications she was taking.  Defendant argues that, to the
contrary, Plaintiff's physical therapist noted in November 2002, while prescribed Neurontin, that
Plaintiff had no sleeping issues, and that similar notations were made by a physical therapist in
December 2002.  Admin. R. 104, 99.  Defendant argues that, although Plaintiff may have

17

subsequently experienced sleeping problems due to pain, nothing in the record documents that she had sleeplessness due to the medication.

The ALJ found that "[t]he record also fails to document any medication side effects." Admin. R. 21. Plaintiff's physical therapist noted on January 14, 2003, February 13, 2003, April 22, 2003, and June 26, 2003, that sleep was a "severe difficulty/impairment." Admin. R. 58, 159, 164, 166. In multiple locations in her application for disability benefits, Plaintiff reported sleepiness as a side effect of her medication. Admin. R. 62, 67, 78. Thus, ALJ's credibility determination was made from a faulty premise; i.e., his finding that Plaintiff was not totally credible because the record failed to document any medication side effects is contradicted by the record. As a result, the Court finds that the ALJ's decision is not supported by substantial evidence, and that remand is appropriate.

IV.     CONCLUSION

Accordingly, the Court **ADOPTS** the Magistrate Judge's Report and Recommendation, **GRANTS** Plaintiff's Motion for Summary Judgment in part, and **DENIES** Defendant's Motion for Summary Judgment.

s/Marianne O. Battani
MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE


DATED: **March 1, 2007**

18

## CERTIFICATE OF SERVICE

Copies of this Order were served upon counsel of record on this date by ordinary mail and/or electronic filing.

s/Bernadette M. Thebolt
DEPUTY CLERK
